917 So.2d 1 (2005)
Travis BONVILLAIN
v.
PREFERRED INDUSTRIES AND LWCC.
No. 2004 CA 0849.
Court of Appeal of Louisiana, First Circuit.
May 27, 2005.
Rehearing Denied July 11, 2005.
*2 John B. Fox, Robert W. Booksh, Jr., New Orleans, Counsel for Plaintiff/Appellee Travis Bonvillain.
*3 F. Dominic Amato, Terrell A. Thomas, Baton Rouge, Counsel for Defendants/Appellants Preferred Industries, Inc. and LWCC.
Before: PARRO, KUHN, and WELCH, JJ.
KUHN, J.
This appeal arises from an Office of Workers' Compensation ("OWC") judgment, which found that claimant, Travis Bonvillain, was permanently and totally disabled as a result of a work-related accident and entitled to receive workers' compensation benefits. Defendants, Preferred Industries, Inc. ("Preferred Industries"), Bonvillain's employer at the time of the accident, and Louisiana Workers' Compensation Corporation (LWCC), Preferred Industries' insurer, have appealed. We reverse in part and affirm in part.

I. PROCEDURAL AND FACTUAL BACKGROUND
On April 27, 1998, while in the course and scope of his third day of employment as an industrial mechanic's helper, Bonvillain sustained a crushing injury to his left foot when a large tool fell on it. Bonvillain received treatment for his foot at a hospital emergency room. After diagnosing multiple fractures of the metatarsal bones in Bonvillain's foot, Dr. Gary Guidry, an orthopedic surgeon, performed an open reduction and internal fixation surgery, followed by skin-grafting surgery about two months later. In May 1998, Bonvillain reported back pain to Dr. Guidry, which he related to a twisting motion made during the work accident. In September 1998, Dr. Guidry treated Bonvillain for lumbosacral strain, and he recommended that Bonvillain should have an MRI scan of the lumbar spine to rule out the possibility of a herniated disc.
According to LWCC, when it challenged the necessity of the lumbar MRI, the director of the OWC's medical management section appointed Dr. Christopher E. Cenac, an orthopedic surgeon, to perform an independent medical examination ("IME"). Dr. Cenac examined Bonvillain on October 7, 1998, and noted that Bonvillain had sustained a previous neck and back injury in August 1996, resulting from a motor vehicle accident, and that Bonvillain had remained off work from 1996 until April of 1998.
Dr. Cenac found that Bonvillain walked with a "very slight limp," but his x-ray examinations confirmed that his metatarsal fractures had healed. Upon performing a lumbar examination, Dr. Cenac reported that Bonvillain displayed "gross symptom magnification." He noted that Bonvillain "held himself rigid and resisted range of motion." When Dr. Cenac attempted straight leg raise examinations, "[Bonvillain] complained of severe pain and jumped up on the table at 30 degrees of extension." Dr. Cenac stated this conduct was "non-physiologic." Dr. Cenac completed lumbar x-ray studies and found no objective evidence of lumbar injury.
Dr. Cenac concluded that Bonvillain needed no treatment for his complaints of low back pain. Regarding Bonvillain's foot injury, Dr. Cenac found that Bonvillain was approaching maximum medical improvement and did not need further physical therapy. He stated that Bonvillain should "obtain a lace up boot and attempt to return to gainful employment." He further noted that a functional capacity examination ("FCE") could determine whether there were specific physical limitations applicable to the foot condition.
On November 11, 1998, Bonvillain saw Dr. Guidry and again complained of back pain. He also reported that his left foot was symptomatic following an automobile *4 accident that had occurred on October 23, 1998. On January 6, 1999, Bonvillain reported to Dr. Guidry that the automobile accident had increased his back pain. On February 3, 1999, Dr. Guidry reported that Bonvillain's foot was "doing well," but his back remained symptomatic.
Upon Dr. Guidry's recommendation, a lumbar MRI was performed on June 29, 1999. Based on the MRI test results, Dr. Guidry found that Bonvillain had "a degenerative disc at the L5 level of a mild degree, [with] no compression upon [the] nerve root structures." Dr. Guidry recommended that Bonvillain perform a home exercise program and treat his back pain with over-the-counter medications. As a result of Bonvillain's back strain superimposed on a degenerative disc, Dr. Guidry assigned a five percent permanent partial impairment of the whole body. As a result of his foot injury, Dr. Guidry assigned a whole body impairment of three percent.
Dr. Guidry also recommended that Bonvillain undergo an FCE, which was performed at Terrebonne Physical Therapy Clinic on July 13, 1999. The FCE showed that Bonvillain was capable of performing heavy-duty labor, and Dr. Guidry found the FCE was valid. He determined that Bonvillain had reached maximum medical improvement and could return to work as of August 6, 1999.
On August 16, 1999, Bonvillain began treatment with a neurosurgeon, Dr. David M. Jarrott. Bonvillain complained of pain in his left foot, pain and muscle spasms in his low back, and bilateral leg weakness. Based on a reported finding of tenderness in the lumbar muscles and ligaments, and the June 1999 lumbar MRI scan, Dr. Jarrott diagnosed lumbar insufficiency post injury. He noted that the lumbar scan showed "mild swelling of L4-5 and L5-S1 discs with accentuated lordosis (`degenerative disc disease L4-5 with mild canal stenosis')." Based on these findings, he classified Bonvillain as "totally disabled." Dr. Jarrott prescribed pain medication and sedatives and advised Bonvillain to return as needed.
At defendants' request, Dr. H. Carson McKowen, another neurosurgeon, performed an examination of Bonvillain on November 9, 2000. Although Bonvillain reported pain in his left foot and his lower back, Dr. McKowen found no evidence of lumbar muscle spasm and determined that Bonvillain's performance during his examination was inconsistent with his FCE. Dr. McKowen concluded that Bonvillain greatly exaggerated his complaints and seemed to be feigning injury.[1] Dr. McKowen also reported that during the examination, Bonvillain claimed he was unable to bend forward more than ten degrees voluntarily, yet he assumed the posture of twenty degrees of flexion when left unattended using a cane. Dr. McKowen further assessed the visit as follows:
The patient's claimed inability to heel walk or toe walk was inconsistent with [his] ambulation. The dramatic display of pain on touching his right lower extremity and barely moving it was simply ridiculous and not consistent with any valid examination I have ever performed. Since it was clear that the patient was completely uncooperative with the examination and was claiming that I hurt him severely with very no-naggressive *5 and routine maneuvers, I terminated the examination.
Dr. McKowen also reported that the June 1999 MRI scan of Bonvillain's lumbar spine was perfectly normal, showing no objective signs of back injury. He criticized Dr. Jarrott's statement that the MRI "showed mild swelling of L4-5 and L5-S1 discs," stating, "I frankly have never heard of such pathology. I have never seen a swollen disc. The disc has no blood supply and, to my understanding, is incapable of edema." Ultimately, Dr. McKowen deferred to Dr. Guidry's assessment of three percent whole body impairment for the foot, but he assigned no impairment to Bonvillain's back.
Bonvillain did not return to work, and he continued seeing Dr. Jarrott, who continued to find him totally and permanently disabled. On November 22, 2002, Dr. Jarrott reported Bonvillain's diagnosis as "Lumbar disc and foot disease; Lumbar Neuralgia; Fibromyoclonoesmigatory L4-5 disc protrusion with thecal impingement with persistent symptoms compatible with sciatic neuropathy as a result of the accident on April 27, 1998." Dr. Jarrott recommended chronic pain management and continued medication. On November 23, 2002, Dr. Jarrott completed a "Medical Assessment of Ability to Do Work-Related Activities." Therein, he reported that Bonvillain was unable to push and pull due to low back strain and was unable to engage in sustained exertion.
Defendants consistently paid indemnity and medical benefits to Bonvillain. Betty Guy, a LWCC senior claims representative who had been handling Bonvillain's workers' compensation claim, testified at the trial that LWCC began making payments to Bonvillain in April 1998, and continued paying them through the date of trial, except for several weeks during which Bonvillain was incarcerated. As of the trial date, defendants had paid medical benefits totaling $44,652.26 and indemnity benefits totaling $72,270.94. Despite these payments, Bonvillain filed a disputed claim form in proper person in January 2003.[2] He claimed he was one-hundred percent permanently and totally disabled, and he sought "the maximum benefit allowable." Bonvillain also filed a "motion for a lump sum settlement" and a "motion to settle mediation."
Defendants answered Bonvillain's claim, admitting he had sustained an injury to his left foot in April 1998, during the course and scope of his employment with Preferred Industries, but denying that he remained disabled. Defendants also filed a motion to compel a medical examination by Dr. Carl Lowder, another neurosurgeon.[3] The OWC ordered Bonvillain to appear for an examination with Dr. Lowder, and this examination took place in March 2003.
Based on this physical examination, Dr. Lowder noted that he could barely move any extremity without Bonvillain complaining of pain. Dr. Lowder described Bonvillain's effort as "limited and guarded." Ultimately, Dr. Lowder found the examination of Bonvillain's back was "unremarkable" and that Bonvillain's June 1999 MRI report was a "normal study." Dr. Lowder provided the following assessment of Bonvillain's condition in his March 18, 2003 office note:

*6 [Bonvillain] suffered a blunt fracture injury of the left foot.... Any impairment rating related to the left foot should be deferred to Dr. Guidry. In regards to his injury to the back, at most by his mechanism, he may have suffered a lumbar strain back in 1998. He should have recovered within two to three months.... [H]e has had four bouts of therapy. I do not think there is any other management or treatment of his lumbar spine. I honestly do not understand Dr. Jarrot's (sic) terminology whatsoever for giving him 100% disability with what sounds like a completely normal lumbar exam by MRI and physical exam by precedent partners, i.e., Dr. McKowen. The patient's presentation is a complete psychological overlay of pain and really does not have anatomical explanation in my opinion.... I do not believe that pain management is to benefit this gentleman except to further his dependent personality and dependent role ... since 1998 ... in terms of employment.
In regards to his return to gainful employment, his original F.C.E. that released him for ... heavy duty work is what I would refer to but I would predict very strongly that psychologically this gentleman is going to be reluctant to ever return to any gainful employment.
Finally, . . . I do not believe there has been any significant injury to the lumbar spine . . . .
Dr. Lowder's report further noted that Dr. Jarrott had assigned Bonvillain's disability based on his diagnosis of "fibromyoclonoesmigratory L4-5 disc protrusion with thecal impingement." Dr. Lowder stated he had never seen such a diagnosis in eighteen years of medical practice.
Based on Dr. Lowder's opinion, defendants requested another IME, which was performed by Dr. Michael Carey on June 5, 2003. After conducting a neurological exam, Dr. Carey found no objective evidence of neurological disease or significant abnormalities. When Dr. Carey recommended that Bonvillain obtain an updated MRI scan, Bonvillain told him he did not wish to have another one. Dr. Carey also noticed that Bonvillain had a "slightly antalgic gait" while he was in the examining room but while he was walking in the corridor of the office, he had a "perfectly normal gait."
In a June 6, 2003 letter to LWCC, Dr. Carey stated, "one orthopaedic surgeon (Dr. Cenac) and three neurosurgeons (Drs. McKowen, Lowder, and Carey) cannot find any objective, consistent evidence of neurologic dysfunction." Dr. Carey additionally noted that Bonvillain's 1999 FCE performed one year after injury evidences that he has a good physical capacity. Dr. Carey reported that although Dr. Jarrott found Bonvillain to be 100 percent permanently and totally disabled, Dr. Jarrott had not included a true neurological examination to support his conclusion.
Dr. Carey also commented that while Dr. Jarrott deemed Bonvillain to be totally disabled based upon the diagnosis of "fibromyoclonoesmigatory L4-L5 disk protrusion," this diagnosis did not appear in the International Classification of Diseases 9th Revised Edition 2002. Dr. Carey found the diagnosis was a neologism with no meaning. Initially, Dr. Carey could not comment on Dr. Jarrott's finding of "L4-L5 disk protrusion," because Bonvillain did not bring his MRI scan for Dr. Carey's review. In September 2003, however, Dr. Carey reviewed Bonvillain's 1999 MRI scan and found the changes at the L4-L5 interspace were not clinically significant. He further found that the MRI scan showed no bulging disks and no compression of the thecal sac or of any nerve roots. In a September 2003 letter to LWCC, Dr. *7 Carey stated that based on his neurological exam and his review of the lumbar MRI scan, Bonvillain should be able to return to work.
Dr. Jarrott's notes from Bonvillain's August 5, 2003 office visit address Dr. Carey's comments regarding his medical diagnosis. Therein, Dr. Jarrott states, "Early research suggest that [the previously reported diagnosis of fibromyoclonoesmigratory L4-5 disc protrusion] was a compounded typographical misconstruction. The actual diagnosis is [L4-5 degenerative disc with mild stenosis; post operative complex fracture of left foot with neuralgia]." In his notes pertaining to a September 9, 2003 office visit, Dr. Jarrott indicated, "[Bonvillain] is 100% disabled. He is disabled for sustained exertion and is a poor candidate for rehabilitation."
By the time of trial in September 2003, Bonvillain was represented by counsel, who represented that what Bonvillain actually sought pursuant to his motion for a lump sum settlement was a determination of his disability status. Defense counsel initially contended that Bonvillain's request for a lump sum settlement was not properly before the court, but she later conceded that Bonvillain's disability status and his entitlement to additional benefits were properly before the court.
During the trial, Bonvillain, who was then 31 years old, testified that he regularly uses the following medication prescribed by Dr. Jarrott for his pain management: Vicodin HP, Hydrocodone, Methadone, and Soma. Bonvillain also testified that he has been receiving Social Security benefits since June 2000, based on a finding of total and permanent disability. He stated he has not worked since the day of his work-related accident in 1998, and he has only worked two days and one hour in the last seven years. Bonvillain confirmed he had also been in an automobile accident in October 1998 and again in November 2002. He further testified that he had been convicted of four counts of indecent behavior with a juvenile and was imprisoned for those crimes in February 2000.
In an October 31, 2003 judgment, the OWC ordered that Bonvillain was permanently and totally disabled as a result of his April 27, 1998 work injury, and that he was entitled to "all related workers' compensation benefits, including indemnity benefits and all reasonable/necessary medical benefits." In reasons for judgment, the workers' compensation judge ("WCJ") concluded, "[b]ased on the testimony at trial and record of Dr. Jarrott, the claimant is totally and permanently disabled." The WCJ further stated, "[T]he decision and findings of the Social Security Administration are afforded consideration in this Court's decision . . . ."[4]
Defendants have suspensively appealed the OWC's October 31, 2003 judgment, asserting the WCJ erred in finding that Bonvillain was permanently and totally disabled as a result of the April 27, 1998 work injury and that he was entitled to receive workers' compensation benefits.

II. ANALYSIS

A. Standard of Review
In a workers' compensation case, the appellate court's review of factual findings *8 is governed by the manifest error or clearly wrong standard. Chaisson v. Cajun Bag & Supply Co., 97-1225, p. 8 (La.3/4/98), 708 So.2d 375, 380. Thus, a factual finding cannot be set aside unless the appellate court finds it is manifestly erroneous or clearly wrong. Stobart v. State Through DOTD, 617 So.2d 880, 882 (La.1993). But where documents or objective evidence so contradict the witness's story, or the story presented by the witness is so internally inconsistent or implausible on its face, that a reasonable fact-finder could not give credence to the witness's testimony, there is no legitimate conflict. Faced with such circumstances, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Landiak v. Richmond, 05-0758, p. 10 (La.3/24/05), 899 So.2d 535, citing Rosell v. ESCO, 549 So.2d 840, 845 (La.1989). Additionally, where the tribunal's decision is based on an erroneous interpretation or application of law, rather than a valid exercise of discretion, such an incorrect decision is not entitled to deference by the reviewing court. Hand v. City of New Orleans, 04-0845, p. 5 (La.App. 4th Cir.12/22/04), 892 So.2d 609, 612, writ denied, 05-0143 (La.4/1/05), 897 So.2d 603.

B. Permanent Total or Temporary Total Disability
A claimant who seeks temporary total or permanent total disability benefits must prove by clear and convincing evidence, unaided by any presumption of disability, that he is physically unable to engage in any employment or self-employment, regardless of the nature or character of the work. La. R.S. 23:1221(1)(c) and (2)(c). In the absence of such evidence, the claimant's demand for temporary total or permanent total disability benefits fails. Walker v. High Tech Refractory Services, Inc., 03-1621, pp. 3-4 (La.App. 1st Cir.6/25/04), 885 So.2d 1185, 1188. The "clear and convincing" standard is an intermediate standard falling somewhere between the ordinary civil "preponderance of the evidence" standard and the "beyond a reasonable doubt" standard of a criminal prosecution. Comeaux v. City of Crowley, 01-0032, pp. 8-9 (La.7/3/01), 793 So.2d 1215, 1220, quoting Hatcherson v. Diebold, Inc., 00-3263, p. 4 (La.5/15/01), 784 So.2d 1284. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, in other words, much more probable than not. Carter v. Williamson Eye Center, 04-0527, p. 8 (La.App. 1st Cir.2/11/05), 906 So.2d 503.
The issue of disability within the framework of the workers' compensation law is a legal rather than a purely medical determination. The issue of disability is determined with reference to the totality of the evidence, including both lay and medical testimony. Walker v. High Tech Refractory Services, Inc., 03-1621 at p. 4, 885 So.2d at 1188. However, in order for a claimant to establish that he is disabled such that he is unable to engage in any employment, he must introduce objective medical evidence supporting the existence of a disabling condition. Flanders v. McDonald's Restaurant, 02-184, p. 2 (La. App. 3d Cir.10/2/02), 828 So.2d 682, 685, writ denied, 02-2705 (La.12/19/02), 833 So.2d 340; Fritz v. Home Furniture-Lafayette, 95-1705 (La.App. 3d Cir.7/24/96), 677 So.2d 1132, 1134. While the workers' compensation laws are to be construed liberally in favor of the claimant, that interpretation cannot lessen the claimant's burden. Isaac v. Lathan, 01-2639, p. 13 (La. App. 1st Cir.11/8/02), 836 So.2d 191, 199.
*9 The WCJ's reasons for judgment establish that he relied on the testimony of the claimant, Dr. Jarrott's medical records, and the Social Security Administration decision to support his finding that claimant was permanently and totally disabled.
First, we address whether the WCJ properly relied on the Social Security Administration decision to support its disability finding. In a June 30, 2000 Social Security Administration decision, the administrative law judge ("the ALJ") found that, based on Dr. Jarrott's assessment, Bonvillain was disabled and would remain disabled for at least 24 months due to his abnormal gait and lumbar disc syndrome. The ALJ concluded that Bonvillain needed to be re-evaluated in twenty-four months from the date of his decision. We note the record contains no such re-evaluation by the Social Security Administration. Accordingly, we conclude the June 30, 2000 decision is not determinative of Bonvillain's physical condition as of September 2003, when the OWC hearing was held. The WCJ erred by placing any weight on this decision.
We further find that Bonvillain's testimony does not support a finding that he was totally disabled, such that he was unable to engage in any kind of work. Although Bonvillain testified he was permanently and totally disabled, he did not provide any details regarding his physical limitations. And although Bonvillain testified he has been taking pain medication, even evidence of chronic pain is not enough to establish disability because chronic pain does not meet the requirements of "physical" disability under La. R.S. 23:1221(1)(c) or (2)(c). See Hand v. City of New Orleans, 04-0845 at p. 7, 892 So.2d at 613; Bank of Winnfield and Trust Co. v. Collins, 31,473, p. 5 (La.App. 2d Cir.2/24/99), 736 So.2d 263, 266. Thus, Bonvillain's testimony does not support a finding that he is physically unable to engage in any employment or self-employment.
Lastly, we address whether Dr. Jarrott's medical reports and opinions were sufficient to support the WCJ's finding of disability. Initially, Dr. Jarrott diagnosed "fibromyoclonoesmigratory L4-5 disc protrusion with thecal impingement," a diagnosis that was challenged as non-existent by the other neurosurgeons who examined Bonvillain. On August 5, 2003, Dr. Jarrott modified his diagnosis to L4-5 degenerative disc with mild stenosis and postoperative complex fracture of left foot with neuralgia. As of that date and as of his September 2003 office visit, Dr. Jarrott's only support for his finding that Bonvillain was one hundred percent disabled was that he was unable to engage in sustained exertion. This finding alone does not establish that he was unable to engage in any type of employment.
Additionally, the WCJ failed to give proper weight to the findings of Dr. Carey, the last IME that examined Bonvillain, in accordance with Louisiana Revised Statutes 23:1123. This statute provides:
If any dispute arises as to the condition of the employee, the [OWC] director, upon application of any party, shall order an examination of the employee to be made by a medical practitioner selected and appointed by the director. The medical examiner shall report his conclusions from the examination to the director and to the parties and such report shall be prima facie evidence of the facts therein stated in any subsequent proceedings under this Chapter. (Emphasis added.)
Dr. Carey examined Bonvillain in June 2003, and found that although Dr. Jarrott had found Bonvillain to be totally disabled, *10 Dr. Jarrott had not included a true neurological examination to support his conclusion. Dr. Carey stated that he and two other neurosurgeons (Drs. McKowen and Lowder) and an orthopaedic surgeon (Dr. Cenac) could not find any objective evidence of neurologic dysfunction. Upon reviewing the MRI scan, Dr. Carey found that the degenerative changes at the L4-L5 interspace were not clinically significant and that the MRI scan did not show bulging disks or any compression of the thecal sac or of the nerve roots. Based on these objective medical findings and the 1999 FCE, which established that Bonvillain was physically capable of performing manual labor, Dr. Carey concluded that Bonvillain was able to return to work.
Pursuant to Louisiana Revised Statutes 23:1123, Dr. Carey's findings are prima facie evidence that Bonvillain was not totally and permanently disabled. Dr. Jarrott's findings to the contrary, which are contradicted by three neurosurgeons and an orthopedic surgeon, are not supported by any objective, medical evidence. Accordingly, Dr. Jarrott's findings are insufficient to rebut Dr. Carey's medical conclusions. The WCJ was manifestly erroneous in finding otherwise. Since there is no other evidence in the record to support the WCJ's findings that Bonvillain was physically unable to engage in any employment or self-employment, the WCJ erred in finding that Bonvillain is entitled to receive indemnity benefits. Accordingly, we reverse the judgment insofar as it finds that Bonvillain is permanently and totally disabled and is entitled to recover indemnity benefits.
We recognize, however, that the right to medical expenses is separate and distinct from the right to disability benefits, and that an employer has a statutory duty to furnish all necessary medical treatment caused by a work-related injury. La. R.S. 23:1203; Walker v. High Tech Refractory Services, Inc., 03-1621 at p. 4, 885 So.2d at 1188. Accordingly, an employee may recover medical expenses even though there is no recovery for disability benefits. In the instant case, Bonvillain remains entitled to recover medical expenses, if any, established to be necessary and related to his work injury.

III. CONCLUSION
For these reasons, we reverse those portions of the October 31, 2003 judgment that found Bonvillain was permanently and totally disabled as a result of his work injury and was entitled to indemnity benefits. We affirm that part of the judgment that finds Bonvillain was entitled to recover medical benefits that are necessary and related to his work injury. All costs are to be paid by Bonvillain.
REVERSED IN PART AND AFFIRMED IN PART.
NOTES
[1] Specifically, Dr. McKowen noted, "I attempted to do a straight leg raise testing in the sitting position using the right leg. I moved the patient's leg one-quarter of an inch [, and] he howled in pain and lurched back." Dr. McKowen also stated, "I asked him to then brace himself on the table with his hands and I again moved his leg one-quarter of an inch at which point he howled dramatically in pain."
[2] Defendants have not urged the dilatory exception raising the objection of prematurity, and thus, have waived their right to assert this objection. See La. R.S. 23:1314 and Wilson v. St. Mary Community Action, 00-2106 (La.App. 1st Cir.12/28/01), 803 So.2d 1106, 1111-12.
[3] The record establishes that Dr. McKowen had retired as of this time.
[4] Defendants also filed a motion for new trial. They asserted that a new trial should be granted based on newly discovered evidence. Defendants asserted they had learned after trial that: 1) Dr. Jarrott's medical license had been suspended for a three-year period; 2) St. Tammany Parish Sheriff's Officers investigated cases where Dr. Jarrott had prescribed narcotic medications to two individuals who had died; and 3) according to the Louisiana State Board of Medical Examiners, Dr. Jarrott is prohibited from being associated with the treatment of chronic pain since September 26, 2003. On January 30, 2004, the OWC denied defendants' motion for new trial, and defendants have not appealed this judgment.