984 So.2d 808 (2008)
Louis CHAMPAGNE
v.
ROCLAN SYSTEMS, INC.
No. 2006 CA 1928.
Court of Appeal of Louisiana, First Circuit.
February 20, 2008.
Rehearing Denied May 30, 2008.
*812 Cassandra Krebs, Covington, LA, for Plaintiff-Appellee, Louis Champagne.
Leon A. Aucoin, Covington, LA, for Defendants-Appellants, Roclan Systems, Inc. and The Gray Insurance Company.
Henry H. LeBas, Todd A. Delcambre, Lafayette, LA, for Defendant-Appellee, Eagle Pacific Insurance Company.
Travis R. LeBleu, Baton Rouge, LA, for Defendant-Appellee, Louisiana Workers' Compensation Corporation.
Before PARRO, GUIDRY, and McCLENDON, JJ.
GUIDRY, J.
An employer and its insurer appeal a judgment of the Louisiana Office of Workers' Compensation that awarded workers' compensation benefits to its former employee. For the following reasons, we affirm.

FACTS AND PROCEDURAL
Louis Champagne (Champagne) was employed by Roclan Systems, Inc. (Roclan) as a diesel mechanic to work on survival crafts that were placed on drilling rig platforms. In September 2001, Champagne allegedly injured his lower back while lifting something heavy in the shop. In December 2001, Roclan paid $2333.76 in indemnity benefits in connection with the September 2001 incident. Champagne was also paid $266.50 on January 4, 2002, for time missed from work. Medical benefits were never paid to or on behalf of Champagne by Roclan. Champagne's medical expenses were paid by his private medical insurer. Meanwhile, Champagne continued his employment with Roclan until he was terminated on November 11, 2002. In 2003, Champagne worked for A-Pro Pest Control, Inc. (A-Pro). According to Champagne, he quit his job with A-Pro after a few months because the physical demands of the job caused him pain. Afterwards, Champagne indicated that he was unable to find suitable work as a supervisor for a contracting company.
At some point, Champagne filed a claim for disability benefits with his private insurer, AFLAC, for his back condition, which was denied. Thereafter, on September 19, 2003, Champagne filed a claim for *813 workers' compensation benefits against Roclan and its workers' compensation insurer, The Gray Insurance Company (Gray), indicating that an accident had occurred at work on September 22, 2001, resulting in an injury to his lower back for which no wage benefits had been paid. In his disputed claim, as amended, Champagne prayed for indemnity benefits, specifically supplemental earnings benefits (SEB), from November 2002 to the present. In response to his claim, Roclan urged that Champagne's claim was prescribed on its face. Alternatively, Roclan asserted that Champagne's back condition was a continuation of a long-standing back problem dating back to April 1998. Roclan filed a third-party demand against Eagle Pacific Insurance Company (Eagle) and Louisiana Workers' Compensation Corporation (LWCC), its workers' compensation insurance providers during other relevant time periods.
After the trial of this matter, the workers' compensation judge (WCJ) found that an accident occurred on September 28, 2001; awarded $1,711.40 per month in SEB retroactive to November 11, 2002, with a credit for the amount earned while Champagne was employed by A-Pro; awarded reasonable and necessary medical expenses, subject to a credit for past amounts paid by Champagne's private insurer; awarded $357.18 as reimbursement for out-of-pocket medical expenses; denied Roclan's exception raising the objection of prescription; dismissed the third-party demands of Roclan and Gray against Eagle and LWCC; and denied Champagne's claim for penalties and attorney fees. From the judgment, Roclan and Gray appealed.

ASSIGNMENTS OF ERROR
In this appeal, Roclan and Gray have assigned the following determinations by WCJ as being made in error:
1. The [WCJ] erred in finding that Mr. Champagne has sustained a compensable work[-]related injury to his back at Roclan Systems, Inc. on September 28, 2001.
2. The [WCJ] erred in awarding supplemental earnings benefits to Mr. Champagne in the amount of $1,711.40 per month, retroactive to November 11, 2002, and continuing until such time as modification is appropriate.
* * *
5. The [WCJ] erred in not finding that Mr. Champagne's claims against Roclan Systems, Inc. and The Gray Insurance Company had prescribed.
6. The [WCJ] erred in not finding that Mr. Champagne was totally and permanently disabled as the result of his low back injury.
7. The [WCJ] erred in not finding that the back injury sustained by Mr. Champagne in 2001 was a continuation of the same back injury he had in 1998 or before.
* * *
9. The [WCJ] erred in not applying the provisions of [La. R.S.] 23:120[8] based on trial testimony of Louis Champagne.[[1]]

DISCUSSION
The workers' compensation laws provide coverage to a worker for personal injury by accident arising out of and in the *814 course of employment. La. R.S. 23:1031(A). A worker must prove the chain of causation required by the workers' compensation statutory scheme. He must establish that the accident was work-related, that the accident caused the injury, and that the injury caused the disability. Magee v. Abek, Inc., 04-2554, p. 4 (La.App. 1st Cir.4/28/06), 934 So.2d 800, 806, writ denied, 06-1876 (La.10/27/06), 939 So.2d 1287. Initially, a worker has the burden of establishing by a preponderance of the evidence that an accident occurred on the job and that he sustained an injury. Holiday v. Borden Chemical, 508 So.2d 1381, 1383 (La.1987). Louisiana Revised Statute 23:1021 defines "accident" as follows:
"Accident" means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
An accident is deemed to exist when heavy lifting or strenuous efforts, although usual and customary, cause or contribute to a physical breakdown or accelerate its occurrence because of a pre-existing condition. Hall v. J.E. Merit Constructors, Inc., 02-2648, p. 6 (La.App. 1st Cir.11/7/03), 861 So.2d 224, 227. The jurisprudence consistently construes liberally the requirement of a work-related accident to be eligible for workers' compensation benefits. Despite the liberal construction afforded the employee in a workers' compensation action, the employee's burden of proof is not relaxed. Bruno v. Harbert International Inc., 593 So.2d 357, 360-61 (La. 1992). The employee is still required to identify the event marking the time when one can identify an injury. Hall, 02-2648 at p. 6, 861 So.2d at 228.
Next, a worker must establish a causal connection between the injury and the resulting disability by a preponderance of the evidence. See West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1147 (La. 1979). Causation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the fact finder based on all credible evidence. Magee, 04-2554 at p. 4, 934 So.2d at 806.
Even if the worker suffered from a pre-existing medical condition, he may still meet his burden of proof of causation if he proves that the accident aggravated, accelerated, or combined with the pre-existing condition to produce an injury resulting in a compensable disability.[2]See Peveto v. WHC Contractors, 93-1402 (La.1/14/94), 630 So.2d 689, 691. He may be aided in meeting the foregoing burden by a presumption of causation, if he can prove that before the accident he had not manifested disabling symptoms, that such symptoms commenced with the accident and manifested themselves thereafter, and that either medical or circumstantial evidence indicates a reasonable possibility of causal connection between the accident and the onset of the disabling symptoms. Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320, 324-25 (La. *815 1985). Whether a worker has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the workers' compensation judge. Harrison v. Baldwin Motors, 03-2682, p. 4 (La.App. 1st Cir.11/3/04), 889 So.2d 313, 316, writ denied, 05-0249 (La.4/1/05), 897 So.2d 609.
Thus, the issues to be determined initially are whether Champagne established by a preponderance of the evidence that a work-related accident occurred in September 2001 and that he sustained an injury. It will then need to be determined whether Champagne has shown by a preponderance of the evidence that any such injury is the cause of his current condition, resulting in his inability to earn wages equal to ninety percent or more of wages at the time of the injury.[3]
Stan Elmore (Stan), who was an owner of Roclan, was responsible for handling workers' compensation claims. While Champagne was working for Roclan, Champagne had reported the occurrence of two accidents to Stan, one in 1998, and the other in 2001.
At trial, Champagne testified that he hurt his back at work on November 2, 1998, while lifting a battery from a compressor used for sandblasting. Following this accident, he sought medical treatment at NorthShore Regional Medical Center from Dr. Mohammad Abdul Naeem. A CT scan performed on November 5, 1998, revealed: a posterior lateral disc protrusion/herniation at the L3-4 level into the left neural foramina with left neural foraminal stenosis; mild spinal canal stenosis secondary to hypertrophy; a central disc bulge at the L4-5 level without spinal canal or neural foraminal stenosis; and possible bilateral neural foraminal stenosis at the L5-S1 level secondary to hypertrophy and spur formation and mild circumferential disc bulge.
Champagne visited Dr. John B. Logan, an orthopedic surgeon, on November 6, 1998, with complaints of lower back pain with bilateral buttock pain. X-rays showed a mild disc space narrowing at the L4-5 level with mild degenerative changes noted throughout the lumbar spine. Dr. Logan's impression was lumbar sprain/strain syndrome and possible anular disruption at the L3-4 level. His diagnosis was degenerative disc disease. According to Stan, Champagne worked two or three hours a day for a period of three or four weeks. On November 30, 1998, Champagne was released by Dr. Logan to return to work. Champagne testified that he returned to work at full capacity and in good shape. Roclan paid him for the time that he had missed from work, as well as his medical bills. According to Dr. Logan, Champagne's back condition improved significantly after three weeks of physical therapy.
On March 27, 2000, Champagne was treated by Dr. Logan's partner, Dr. Susan J. Bryant, who specialized in physical medicine and rehabilitation, for muscle pain in his lower pelvis and lower back, which resulted when he climbed in and out of a boat. Medical records disclosed that Champagne experienced significant pain for two days and that his pain, except for some minor discomfort, resolved with rest, heat, and muscle relaxants. Dr. Bryant's impression was lumbar sprain and strain associated with activity.
Dr. Bart C. Sellers, a chiropractor, saw Champagne on April 1, 2000, for lower back pain that was triggered by his work *816 under a boat at work within the previous three weeks. Champagne reported that he had begun experiencing back pain approximately a year before after he performed heavy lifting at work. Champagne stated that the pain was not as severe as the first time.
According to Champagne, he was pain free for about one year, when he felt a sharp, burning pain in his back, while taking off a brake counterweight when he was refurbishing a Lakeshore winch in September 2001. Champagne described the pain as being different from the pain he experienced in 1998. Champagne explained that in 1998, his back pain was localized more on the right side of his back, whereas in 2001, he felt pain more towards the middle of his back. He also noted that the area of the pain was a little higher than before. Champagne indicated that he had reported the incident to Danny Elmore (Danny), Stan's son, that evening. Danny explained that Champagne reported that he was leaving work a little early because his back was bothering him.[4] Champagne told Danny that he was going to file a claim with AFLAC. In a letter to the United States Department of Labor, dated November 13, 2001, Danny stated:
On September 28, 2001, Louis Champagne went home early; he said his back had been hurting him for a few days and he aggravated it more while moving a 401b. counterweight off of a winch. I was not made aware of his condition until 1:00 pm that day when he said he was leaving due to the sore back. [Champagne] said he had a doctor's appointment set up for the following Monday, October 1, 2001.[[5]]
On October 2, 2001, [Champagne] left a doctor's note stating that he could not work until further notice. I asked him if he was doing this through Worker's Compensation and he said no, that he was doing it through his insurance and AFLAC. I then asked him if he felt he had done this at work. He said his back had been bothering him for a few days (I was not made aware of this) and he thinks he just aggravated it more when he moved the winch counterweight. He said he believes his back just flares up sometimes and he would call me later in the week with an update.
Stan testified that he did not think that AFLAC would pay for Champagne's claim because it had resulted from an alleged injury at work.
On October 1, 2001, Danny authorized Champagne to seek medical attention. That same day, Champagne went to see Dr. Logan. Champagne indicated to Dr. Logan that the pain differed from, and was in a little higher place than, the pain he had experienced in 1998. Champagne explained that the pain in his lower back was constant but not severe. In Dr. Logan's opinion, Champagne's complaint of pain was not as great as the one made in 1998. The results of a MRI of the lumbar spine taken on October 9, 2001, revealed multilevel degenerative disc disease with small central disc protrusion at the L4-5 level and mild foraminal narrowing on the left at the L3-4 and L4-5 levels due to circumferential disc bulge and facet hypertrophy. Dr. Logan's diagnosis was lumbar spondylosis,[6] symptomatic, mechanical back pain, degenerative disc disease.
*817 On November 13, 2001, Dr. Logan released Champagne to return to light duty work as tolerated. Champagne reported to work on November 14. According to Stan, Champagne was just as physically fit for the job following the 2001 accident as he was prior to the accident. Danny testified that Champagne was working at his own pace when he returned to work. According to Danny, when Champagne reported that he was having trouble driving long distances, Roclan used a different driver.
On November 26, 2001, Champagne saw Dr. Allan T. Parr, Jr., an anesthesiologist with a subspecialty in pain management. According to Dr. Parr, the finding from the 1998 CT scan looked similar to the findings of the 2001 MRI, but he could not say for certain just from looking at the reports. On December 12, 2001, Dr. Parr administered transforaminal epidural nerve root injections at the L3-4, L4-5, and L5-S1 levels. During this procedure, medication was injected adjacent to the nerve root to decrease the inflammation around the nerve root and to relieve the pain, which Champagne had rated as five out of 10.
Danny testified that Dr. Logan released Champagne to full duty in January 2002, but there is no indication of such a release in Dr. Logan's medical records or Champagne's work records nor did Dr. Logan testify in his deposition to granting Champagne such release. Nevertheless, after that point in time, Danny did not recall having received a complaint from Champagne about his back.
According to Champagne, following his release, he was able to work, but not at full capacity. Champagne testified that he had to ask for help on some things because he could not lift. He claimed that although he had asked that he not be assigned to take long trips due to pain in his back, he was never accommodated. Furthermore, he testified that he needed a helper when he went offshore. Champagne explained that he would get pain in his lower back that went down his legs while he was working and that he tried to work through it.
When Champagne saw Dr. Bryant on January 15, 2002, he had returned to performing mechanical work. Champagne again visited Dr. Logan's office on March 28, 2002, and was seen by Dr. Bryant, but Dr. Logan could not discern from Dr. Bryant's medical notes whether Champagne was seen because of a lifting incident that allegedly occurred in February 2002 or as a follow-up visit to see how he had responded to the epidural injection that had been administered by Dr. Parr. Dr. Logan observed that Champagne was scheduled for a follow-up visit after his epidural injections and that the visit had occurred within the time frame of when he should have been seen. He also stated that Dr. Bryant had documented that Champagne had one epidural with relief in the medical note. The medical note for that visit did not contain any reference to a February 2002 accident.
Champagne saw Dr. Logan again on September 10, 2002, at which time Dr. Logan noted that although Champagne was still experiencing chronic back pain, he had not had a very severe flare-up and was only using Lortab once, sometimes twice, a day. At that time, Champagne denied having radiating pain, numbness, tingling, or weakness. Dr. Logan's diagnosis was degenerative disc disease of the lumbar spine with occasional flare-ups.
Champagne testified that in November 2002, Danny told him that Roclan no longer needed him since its biggest contractor, Apache, no longer wanted Champagne performing work at its facility. With Champagne no longer able to perform *818 work for Apache, Roclan no longer had a need for him. Although Champagne expressed an interest in working in Roclan's shop, he was told there was no work available for him to perform.
Concerning Champagne's termination, Stan explained that over the years, Roclan had received complaints about Champagne's attitude and job performance from its customers. Champagne was counseled several times on account of these complaints. Nonetheless, Roclan retained Champagne because he was a personal friend of one of the owners. Danny explained that Champagne had the skills and knowledge to do the job and that he was competent as a mechanic when he wanted to be. According to Stan, Champagne's termination had nothing to do with his ability to perform his job duties because of back pain. Danny explained that Champagne was terminated based on complaints from customers and co-employees concerning his attitude (which was described as bad) and work habits (which were described as unsafe). Notations concerning some of these complaints, one of which predated his September 2001 accident, were offered into evidence and concerned improper annual inspections of customer capsules, errors in performing weight-load tests, unsafe work habits, and poor attitude. Danny denied having ever received a complaint about Champagne's inability to do his job because of his back condition.
On March 21, 2003, Champagne saw Dr. Luis R. Espinoza, who specialized in internal medicine, rheumatology, allergies, immunology, and diagnostic laboratory immunology. At that time, Champagne complained of experiencing low back pain and joint pain for five or six years. Dr. Espinoza's findings relative to the lumbar spine were indicative of nerve impingement in the lower spine. X-rays were consistent with osteoarthritis of the degenerative type of joint disease. Dr. Espinoza's diagnosis was osteoarthritis of the hands and lumbar spine and lumbar pain secondary to the osteoarthritis. At that time, Dr. Espinoza gave no opinion as to the etiology of Champagne's back condition or his ability to work.
On April 29, 2003, Champagne returned to see Dr. Parr[7] at which time Champagne rated his back pain as nine out of 10, with leg pain. Dr. Parr's examination revealed pain over the L4-5 and L5-S1 facet joint, which was similar to his prior findings. Dr. Parr's diagnosis of lumbar facet joint syndrome and lumbar radiculopathy was similar to his diagnosis in November 2001, except for the leg pain caused by an irritation at the nerve root. Dr. Parr explained that lumbar spondylosis is similar to lumbar facet joint syndrome in that it is an arthritis or degeneration of the spine. Injections in Champagne's facet joints by Dr. Pan-reduced Champagne's pain to a three.
In June 2003, Dr. Logan noted that Champagne's back condition was a bit worse. He was no longer working and had a little different examination and complaints. According to Dr. Logan, some aspects of Champagne's work had contributed to his back pain to such a degree that he was unable to work.
After seeing Champagne again on June 30, 2003, August 25, 2003, January 14, 2004, July 14, 2004, and March 30, 2005, Dr. Espinoza opined that Champagne's condition was caused by a combination of several trauma incidents and his occupation, which required a significant amount of bending. Although he noted that *819 Champagne had been doing fairly well prior to January 14, 2004 and July 14, 2004 visits, Dr. Expinoza noted that Champagne was unable to work due to the back pain related to a spontaneous flare-up.
On October 25, 2004, Champagne voiced essentially the same complaints to Dr. Logan, and he indicated that he continued to receive injections from Dr. Parr and was not ready to have surgery on his back. During this visit with Dr. Logan, Champagne indicated that he was unable to work and was filing for disability.[8] Dr. Logan admitted that because it had been about a year since he had evaluated Champagne, it would be hard to formulate an opinion regarding his work status, but based on Champagne's increased symptomotology and belief that he was unable to work, Dr. Logan felt that Champagne was unable to work.
In addressing the cause of Champagne's present condition, Dr. Logan explained that Champagne's pain would come and go. Dr. Logan explained that there were documented structural changes in Champagne's lumbar spine. He suffered an injury, was treated conservatively, and got better. According to Dr. Logan, back pain can rarely be cured. Once a person has structural changes and back pain, they will have some degree of pain. Dr. Logan believed that Champagne was in that category. Exacerbations can be brought on from time to time by activities of daily living. Dr. Logan testified that if a period of time passes during which a patient has returned to normal activities and an event leads the patient back to the doctor, then it is reasonable to say that the event caused the complaints for which the patient is being treated.
According to Dr. Logan, there was no one single event that caused the downhill progression. The anatomic cause is the degenerative changes in his low back. The effects of his job were also found to be a reasonable contributing factor to the progression and symptomotology as those activities led to more pain. Dr. Logan noted that heavy work, bending, lifting, and stooping are not beneficial for the lumbar spine and may result in a history of disc degradation. In Dr. Logan's opinion, heavy work contributed to Champagne's degenerative condition each time he engaged in such work. Nonetheless, Dr. Logan did not know the extent to which the September 2001 injury contributed to the downhill progression.
Although lumbar spondylosis can be caused by trauma, Dr. Parr made no determination as to the cause of Champagne's condition.[9] Dr. Parr rendered no opinion as to whether Champagne was able to work in the latter part of 2001; however, he did sign an insurance form indicating Champagne was unable to work from April 29, 2003, to the present.
Based on the above evidence and our review of the entire record, we are unable to find that the WCJ manifestly erred in finding that an accident occurred in September *820 2001. Furthermore, the totality of evidence, including the testimony of the claimant, establishes that the work-related injury in September 2001 aggravated, accelerated, or combined with his pre-existing back condition to produce renewed and progressive symptomotology of the back pain that had resolved following the November 1998 accident, thus establishing the causal connection between the 2001 injury and Champagne's current condition. Accordingly, we find no error in the WCJ's conclusion that Champagne proved by a preponderance of the evidence that his injury in September 2001 was the cause of his current condition and thus reject the first and seventh assignments of error.
Next, as an alternative argument, Roclan and Gray assert that the WCJ erred in awarding Champagne SEB compensation. Instead, they argue that the WCJ should have found that Champagne was permanently and totally disabled and consequently that his claim was prescribed pursuant to La. R.S. 23:1209. Section 1209 A of the Louisiana Workers' Compensation Act provides:
In case of personal injury, including death resulting therefrom, all claims for payments shall be forever barred unless within one year after the accident or death the parties have agreed upon the payments to be made under this Chapter, or unless within one year after the accident a formal claim has been filed as provided in Subsection B of this Section and in this Chapter. Where such payments have been made in any case, the limitation shall not take effect until the expiration of one year from the time of making the last payment, except that in cases of benefits payable pursuant to R.S. 23:1221(3) this limitation shall not take effect until three years from the time of making the last payment of benefits pursuant to R.S. 23:1221(1), (2), (3), or (4). Also, when the injury does not result at the time of, or develop immediately after the accident, the limitation shall not take effect until expiration of one year from the time the injury develops, but in all such cases the claim for payment shall be forever barred unless the proceedings have been begun within two years from the date of the accident. [Footnote omitted; emphasis added.]
In his second supplemental and amending claim, Champagne specifically requested an award of SEB compensation, but as previously stated, Roclan and Gray dispute his entitlement to such an award, contending that the evidence presented establishes that Champagne is permanently and totally disabled. The statutory requirements for establishing both disability classifications are found in La. R.S. 23:1221(2) and (3), which provide in pertinent part:
(2) Permanent total.
(a) For any injury producing permanent total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, and experience, sixty-six and two-thirds percent of wages during the period of such disability.
(b) For purposes of Subparagraph (2)(a) of this Paragraph, compensation for permanent total disability shall not be awarded if the employee is engaged in any employment or self-employment regardless of the nature or character of the employment or self-employment including but not limited to any and all odd-lot employment, sheltered employment, *821 or employment while working in any pain.
(c) For purposes of Subparagraph (2)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (2)(b) of this Paragraph, compensation for permanent total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
(d) Notwithstanding any judgment or determination that an employee is permanently and totally disabled, if such employee subsequently has or receives any earnings, including, but not limited to, earnings from odd-lot employment, sheltered employment, or employment while working in any pain, such employee shall not receive benefits pursuant to this Paragraph but may receive benefits computed pursuant to Paragraph (3) of this Section, if applicable.
(e) The issue of permanent total disability provided herein shall not be adjudicated or determined while the employee is engaged in employment pursuant to R.S. 23:1226(G), but such employment shall not prevent adjudication or determination of the employee's right to any other benefits otherwise provided in this Chapter; however, the employee shall not by virtue of employment pursuant to R.S. 23:1226(G) be deprived of the right to determination or adjudication of permanent total disability herein at a time when he is not engaged in such employment.
(3) Supplemental earnings benefits.
(a) For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed by multiplying his "wages" by fifty-two and then dividing the quotient by twelve.
(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.
(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in *822 any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or employer's community or reasonable geographic region.
(ii) For purposes of Subsubparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment. [Emphasis added.]
* * *
As set forth in La. R.S. 23:1221(2)(c), when an employee is not engaged in any employment or self-employment, compensation for permanent total disability "shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment." Johnson v. East Baton Rouge Parish School Board, 06-1010, p. 4 (La.App. 1st Cir.3/28/07), 961 So.2d 388, 390.
In reviewing the medical evidence presented, it is noteworthy to observe that none of Champagne's treating doctors gave him any disability rating or even referred to his physical ability to work, but rather relied on Champagne's reports of pain in reaching the conclusion that he is unable to work. When specifically asked for an opinion regarding Champagne's work status at his deposition, Dr. Logan replied "[i]t would be hard to formulate that opinion because I have not evaluated him in, what, a year and it was not specifically addressed by my practitioner, but in the same breath I will say the patient reported to me that he was unable to work and was filing for disability, so I would say he's not able to work, based on the record." (Emphasis added). Later in his deposition, Dr. Logan again observed "it's pretty well documented in his chart that over time he got to the point that he felt he could no longer work." (Emphasis added). In medical notes documenting Champagne's visits to his office, Dr. Logan's office noted for a March 31, 2003 visit that Champagne stated "he continues to work as an offshore mechanic[10] and feels he can't do this any longer. He is considering filing for disability because he states the pain is too severe after he has been at work." At a subsequent visit on June 6, 2003, it is documented that patient "has quit workhe is unable to perform job duties."
Champagne's other treating physicians similarly testified. While referring to medical notes compiled in connection with the epidural injections he administered to Champagne, Dr. Parr consistently stated in his deposition that during the course of treatment, he had no opinion regarding Champagne's work status, but said that Champagne informed him that he had stopped working at an April 29, 2003 visit. Dr. Espinoza likewise stated in his deposition that during the course of his treatment, *823 he was made aware of the fact that Champagne was not working, but stated that he did not question why he was not working, as Champagne did not ask his opinion regarding his working ability. During a January 14, 2004 visit, Dr. Espinoza said that he asked Champagne whether or not he was able to do any type of physical activity including work and that Champagne informed him that he was unable to work due to back pain. Dr. Espinoza prescribed a regimen of exercise and physical therapy for Champagne.
A vocational rehabilitation evaluation of Champagne was performed by Carla D. Seyler, a licensed rehabilitation counselor. In her report, Ms. Seyler stated that she had reviewed Dr. Logan's deposition in conjunction with her assessment of Champagne, and based on that review she determined that "[i]n his deposition of December 16, 2004, Dr. Logan considered Mr. Champagne unable to return to work as a result of his back condition." She thus later concluded that "[b]ased on my vocational evaluation of this gentleman, I do not feel that there are jobs that Mr. Champagne can readily perform in his labor market. I do not feel he can be competitively employed at this time." However, based on her personal interview of Champagne, Ms. Seyler noted that Champagne and his wife were raising his six-year-old grandson, he is able to drive if he uses his pain medication, he "piddles" around the house and attempts to garden and repair small items in his home, he participates in aquatic exercises at a health club, and he walks for thirty minutes at a time to maintain and improve his condition.
In his January 3, 2005 deposition, Champagne testified that around his house, he would cut the grass, sweep, mop "and stuff like that. Try to keep up with things." In his March 13, 2006 deposition, he acknowledged that "[a]s long as I don't do anything too strenuous, I'm all right. But if I start trying to lift stuff and do strenuous work for a constant period of time, it acts up." He said he considered anything over 20 to 25 pounds too heavy to lift. During that deposition, he also described some volunteer work he performed for his church, stating that he would go to "old people's houses" to cook for them or to drive them places. He said he also would cook at the church for special events and that he belonged to a hunting club.
Considering the evidence presented concerning Champagne's physical ability to work, we cannot say that the WCJ was clearly wrong in not finding that Champagne was permanently, totally disabled, and instead finding that he was entitled to SEB compensation. Louisiana Revised Statute 23:1221(2)(c) requires that the employee prove that he/she is physically unable to engage in any employment or self-employment, including employment while working in pain. Hand v. City of New Orleans, 04-0845, p. 6 (La.App. 4th Cir.12/22/04), 892 So.2d 609, 613, writ denied, 05-0143 (La.4/1/05), 897 So.2d 603. Following the 1983 amendments to the workers' compensation statute, evidence that an employee could not return to any gainful employment without suffering substantial pain is no longer sufficient to support an award of permanent total disability benefits. Bank of Winnfield and Trust Co. v. Collins, 31,473, p. 5 (La.App. 2d Cir.2/24/99), 736 So.2d 263, 266. See also Bonvillain v. Preferred Industries and LWCC, 04-0849, p. 14 (La.App. 1st Cir.5/27/05), 917 So.2d 1, 9.
Moreover, we find that the evidence presented is sufficient to support the award of SEB compensation, and thus, under the provisions of La. R.S. 23:1209 A, Champagne's claim is not prescribed. Accordingly, we find no merit in Roclan and Gray's assignments of error two, five, and six.
*824 We likewise find no merit in Roclan and Gray's final assignment of error contending that the WCJ erred in failing to find that Champagne violated La. R.S. 23:1208 based on the inconsistency of Champagne's trial and deposition testimony. Section 1208 provides in pertinent part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
* * *
E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.
The requirements for forfeiture of benefits under Section 1208 are that: (1) there is a false statement or representation; (2) it is willfully made; and (3) it is made for the purpose of obtaining or defeating any benefit or payment. Magee, 04-2554 at p. 7, 934 So.2d at 808. The relationship between the false statement and the pending claim will be probative in determining whether the statement was made willfully for the purpose of obtaining benefits. Newman v. Richard Price Construction, 02-0995, p. 5 (La.App. 1st Cir.8/8/03), 859 So.2d 136, 141. The issue of whether an employee forfeited workers' compensation benefits is one of fact, which is not to be reversed on appeal, absent manifest error. Angelo Iafrate Construction Co. v. Herring, 05-1461, pp. 4-5 (La.App. 1st Cir.9/1/06), 943 So.2d 487, 490, writ denied, 06-2365 (La.12/8/06), 943 So.2d 1097.
The inconsistent testimony referred to by Roclan and Gray mainly concerns statements made by Champagne in his depositions about additional workplace accidents that allegedly occurred during his employment with Roclan in February and October 2002. Champagne acknowledged having two more accidents, but plainly declared that he could not recall specific dates as to when his work-related accidents occurred. He clearly relied on and deferred to counsel for Roclan and Gray to establish the time frame of the two additional accidents, as the following exchange illustrates:
A. [Champagne] Yeah. Now we're going where, '02 now?
Q. [Counsel for Roclan and Gray] Well, what I want to do is go to the next one.
A. Is that where we're at, in '02?
Q. It could be.
A. You threw me a date.
Q. February of '02 is the next date that I know of. That doesn't mean that's the next one as far as you know. What I want you to tell me is what is the next one that you remember.
Champagne then went on to describe an accident that occurred while working with a boat, which according to the medical evidence in the record, Champagne mentioned an accident involving a boat to his doctors in March 2000. None of Champagne's medical records document his reporting the occurrence of any accidents in February and October 2002.
The only evidence in the record referring to an accident involving Champagne occurring in February and October 2002 is found in Exhibit 2 submitted by Roclan and Gray, which is described as Champagne's employment file with Roclan. Contained within that in globo exhibit are two copies of a form entitled "Employer Report of Injury/Illness." Both forms state that the date of the report is "12/10/03" and list Champagne as the employee *825 who sustained the injury. On the first form, it states that the date/time of injury was "10/01/02" and that the injury was sustained when the "EMPLOYEE WAS LIFTING A COUNTER WEIGHT." The second form lists the date/time of injury as "02/01/02" and states that injury was sustained when the "EMPLOYEE WAS LIFTING A BOX." Both forms were completed by Danny more than a year after Champagne's termination. At trial, Danny testified that he was only aware of Champagne having two accidents while working for Roclan, in 1998 and in 2001, "and then another two that he claimed after he was fired." Champagne only acknowledged the 1998 and the 2001 accidents at trial.
A false statement, which is inconsequential to the present claim, may indicate that the statement was not willfully made for the purpose of obtaining benefits. Clearly, an inadvertent and inconsequential false statement would not result in forfeiture of benefits. Scott v. Wal-Mart Stores, Inc., 03-0858, pp. 10-11 (La.App. 1st Cir.2/23/04), 873 So.2d 664, 672. Based on the evidence presented, the WCJ did not manifestly err in holding that Champagne did not violate La. R.S. 23:1208. The two additional accidents Champagne referred to in his deposition testimony, but failed to recall at trial, are clearly inconsequential to his workers' compensation claim for two reasons. First, Champagne is not seeking recovery on the basis of either of those accidents. Second, the evidence, even based on Champagne's testimony, is inconclusive as to when the accidents occurred. Thus, we cannot say that the WCJ was clearly wrong in finding that Champagne's testimony regarding the disputed accidents did not violate La. R.S. 23:1208. We, accordingly, reject this final assignment of error raised by Roclan and Gray.

CONCLUSION
Hence, for the foregoing reasons, we affirm the judgment of the Office of Worker' Compensation. Costs of this appeal are assessed to Roclan Systems, Inc. and The Gray Insurance Company.
AFFIRMED.
McCLENDON, J., concurs and assigns reasons.
PARRO, J., dissents in part and assigns reasons.
PARRO, J., dissenting in part.
Based on the evidence and my review of the entire record, I agree with the majority's conclusion that the workers' compensation judge (WG) was not manifestly erroneous in finding that an accident occurred in September 2001. I also agree that the evidence establishes the probability that the work-related injury in September 2001 aggravated, accelerated, or combined with his pre-existing back condition to produce a temporary total disability. However, I believe that the resulting disability eventually resolved to the extent that Champagne was capable of returning to his job as a mechanic by January 2002. My belief is based on the consideration of the facts set out in the majority opinion and the following evidence that was offered at trial.
Danny testified that Champagne was released to full duty by Dr. Logan in January 2002. After that point in time, Danny did not recall having received a complaint from Champagne about his back. Champagne never mentioned to Danny that he was working in pain. In connection with his March 28, 2002 appointment, Dr. Bryant noted that Champagne had one *826 epidural injection with relief.[1] There was no mention in the trial record of further medical treatment for his back condition until September 10, 2002, when Champagne saw Dr. Logan, at which time Dr. Logan noted that although Champagne was still experiencing chronic back pain, he had not had a very severe flare-up and was only using Lortab once, sometimes twice, a day. Dr. Logan's diagnosis was degenerative disc disease of the lumbar spine with occasional flare-ups. Dr. Logan testified that since his 1998 treatment of Champagne, he continued to have a waxing and waning of his symptomotology with a steady downhill course. Over time, Champagne got to the point that he felt he could no longer work. Dr. Logan remarked that Champagne's current condition may have been a natural progression of his 1998 condition.
As to the cause of his current condition, Champagne testified that although he had experienced pain at work, he was unable to pinpoint one specific work event. He just recalled that reported incidents in 1998 and 2001 were the ones that stood out in his mind. Champagne sought payment from Roclan when his claim for disability benefits was denied by AFLAC. Moreover, Champagne testified that in November 2002, Danny told him that Roclan no longer needed him since its biggest contractor, Apache, no longer wanted Champagne performing work at its facility. With Champagne no longer able to perform work for Apache, Roclan no longer had a need for him. Champagne testified that although he expressed an interest in working in Roclan's shop, he was told there was no work available for him to perform.
Based on the totality of the evidence presented, I believe that the resolution of the issue of the causal relationship between the 2001 injury and Champagne's current condition is open to speculation and leaves the probabilities of causation equally balanced, at best. See Harrison, 889 So.2d at 316. Therefore, I think that Champagne failed to meet his burden of proof as to causation.[2] Accordingly, I would reverse those portions of the judgment of the Louisiana Office of Workers' Compensation that awarded supplemental earnings benefits and medical benefits based on a finding that the WCJ manifestly erred in concluding that Champagne proved by a preponderance of the evidence that his injury in September 2001 was the cause of his current condition.[3]
For these reasons, I respectfully dissent in part.
McCLENDON, J., concurs, and assigns reasons.
If sitting as the trier of fact, I would have ruled differently than the workers' compensation judge on the SEB issue and would have found the matter prescribed. However, based on the factual determinations made by the workers' compensation judge, I cannot find reversible error. Therefore, I am bound to concur in the result.
NOTES
[1] Because Roclan and Gray failed to present any argument regarding assignments of error three, four and eight in their brief, those claims are deemed abandoned and will not be discussed in this opinion. Uniform Rules, Courts of Appeal, Rule 2-12.4.
[2] An employer takes an employee as it finds him. Barber Brothers Contracting Company v. Cuccia, 98-0675, p. 3 (La.App. 1st Cir.4/1/99), 734 So.2d 820, 822, writ denied, 99-1258 (La.6/18/99), 745 So.2d 31. The fact that disease alone might have disabled the employee in its ordinary course of progress is not the inquiry. Duncan v. State, Department of Transportation and Development, 556 So.2d 881, 886 (La.App. 2d Cir. 1990). Employers do not pay for every flare-up, but they must compensate workers who prove a disabling aggravation of prior, asymptomatic conditions as a result of an on-the-job injury. Duncan, 556 So.2d at 886-87.
[3] We note that Champagne does not argue that he is now either temporarily or permanently totally disabled.
[4] Stan learned of the 2001 accident from a note that had been shoved under his door.
[5] Danny completed an employer's first report of injury on October 28, 2003, indicating that Champagne aggravated his back while picking up a winch piece that weighed about 45 pounds.
[6] According to Dr. Logan, spondylosis is a wastebasket term for degenerative changes in the back.
[7] Prior to this visit, Champagne had last seen Dr. Parr on December 12, 2001, for transforaminal epidural nerve root injections.
[8] At some point, Champagne began receiving $1,300 per month in social security disability benefits.
[9] According to Dr. Parr, there can be an exacerbation of a patient's spondylosis or facet joint syndrome. Swelling on the facet joint can put pressure on the nerve root, which can cause leg pain. Absent a trauma, swelling is due to the arthritic process. Dr. Parr testified that he treated Champagne for the same problem in 2001 and 2003, which could possibly be the same problem that existed in 1998. He could not state more probably than not that what he saw Champagne for in November 2001 was caused by anything that happened to him at work in September 2001. Furthermore, Dr. Parr felt that Champagne's leg pain in 2003 could have been caused by the progression of his spondylosis.
[10] It is observed that while Champagne testified that he worked for A-Pro Pest Control in the early part of 2003, the evidence shows that he was fired by Roclan in November 2002, thus it is questionable whether he was working in the capacity of an offshore mechanic as noted.
[1] Dr. Parr administered this injection on December 12, 2001.
[2] See Shamburger v. Ribbeck Const. Co., 02-1488 (La.App. 3rd Cir.6/4/03), 847 So.2d 766, 770; Thomas v. Tony's Seafood, Ltd., 633 So.2d 675, 677 (La.App. 1st Cir.1993), writ denied, 94-0223 (La.3/18/94), 634 So.2d 856.
[3] In light of this conclusion, I render no opinion as to the other issues raised on appeal.